**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| JULIE PULLEY, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:10-cv-01236 |
| v. | ) | Judge Wiseman/Brown |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

To:     The Honorable Thomas Wiseman, Senior Judge

**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits (DIB), as provided under Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 12, 13, 14). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 10). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

**I. INTRODUCTION**

Plaintiff filed an application for DIB on May 18, 2007 with an alleged onset date of January 1, 2006, which was later amended to September 1, 2006. (Tr. 112-14). She alleged she was disabled due to bipolar disorder; back, knee, and shoulder pain; hepatitis C; high blood pressure; urinary tract infections; vision problems; and fatigue. (Tr. 126). Her claim was denied

initially and on reconsideration. (Tr. 64-67). Plaintiff requested a hearing before an ALJ, which was held on December 3, 2009 before ALJ Donald E. Garrison. (Tr. 36-61). The ALJ issued an unfavorable decision on January 6, 2010. (Tr. 7-35).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2.    The claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of September 1, 2006, through her date last insured of December 31, 2007 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: Musculoskeletal Disorder; Chronic Hepatitis C infection; Bipolar Affective Disorder; Personality Disorder, not otherwise specified (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to lift and carry 10 to 20 pounds occasionally and 10 pounds frequently, consistent with the performance of sedentary work as defined in 20 CFR 404.1567(a), except as follows: The claimant was limited to jobs that allowed for standing or walking for no greater than four hours in an eight hour work day, and no greater than one hour without interruption. The claimant was further limited to jobs involving limited posturals of bending, squatting, or overhead reaching, but with no other postural limitations. She was further limited to jobs that involved only limited exposure to heat or humidity, climbing, heights, as well as the avoidance of liver damaging chemicals. With respect to the claimant's mental impairments, she was limited to jobs that required that she understood, remembered, and carried out short and simple instructions, and made judgments on simple work related decisions, with only occasional contact with the public, no production rate pace work, and work not requiring changes in work procedures or requirements.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on November 22, 1959, and was 48 years old, which is

defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.     The claimant has at least a high school education or its equivalent, and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from September 1, 2006, the amended alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)).

(Tr. 7-35).

The Appeals Council denied Plaintiff's request for review on October 27, 2010. (Tr. 1-5).

This action was timely filed on December 29, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD[1]

Plaintiff was born on November 22, 1959. (Tr. 112). Her amended alleged onset date of

disability is September 1, 2006.[2] Plaintiff has worked as a cashier and stocker, laborer, and

---

[1] In her Motion, Plaintiff failed to provide any summary of her medical records, as is explicitly required by the scheduling order. (Docket Entry 10). Plaintiff's counsel is expected to both read and obey the scheduling order. Failure to do so may result in the Magistrate Judge adopting the Commissioner's summary of the record. Plaintiff's counsel should remember that "judges are not like pigs, hunting for truffles" and include the information he wishes to highlight in his Motion. *Emerson v. Novartis Pharm. Corp.*, No. 09-6273 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[2] For this reason, the Magistrate Judge has only summarized medical records for the relevant period, from September 1, 2006 to December 31, 2007, Plaintiff's date last insured.

electrician's assistant. (Tr. 199). She finished the 11th grade and later obtained her GED. (Tr. 41).

At the request of Plaintiff's primary care physician, Dr. Scott McLain, Dr. Stephen E. Grinde treated Plaintiff for "floaters" in her vision on September 19, 2006. (Tr. 239). He noted there was no evidence of retinal break or detachment. *Id*.

On October 23, 2006, Plaintiff received an eyeglass prescription from Thomas J. Frye, O.D. (Tr. 240). At an appointment the next day, October 24, 2006, Plaintiff's orthopedic surgeon, Dr. John Lamb, noted that Plaintiff had experienced relief from an injection for two to three months. (Tr. 245).

Plaintiff was treated at Centerstone for her mental health beginning in 2006.[3] On September 5, 2006, Plaintiff questioned her mental diagnosis, as she felt her drug use at the time of her diagnosis may have impacted it. (Tr. 494-95). On September 7, 2006, Plaintiff had vocational counseling and was given job leads in her area. (Tr. 493). Her GAF[4] score on October 18, 2006 was measured at 55, with a range of 35-56 in the previous six months. (Tr. 489). At a follow-up appointment on November 7, 2006, Plaintiff stated her depression was better since

---

[3] The Administrative Record contains additional records from Centerstone that are outside the relevant period.

[4] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

changing medication, but she was still having problems with focus. (Tr. 484). Plaintiff reported on November 7, 2006 that she was doing well on her current medication regime, and she appeared "bright and pleasant" and was proud of being drug-free for four months. (Tr. 467). On February 12, 2007, her GAF was measured at 52, with a range of 51-54 in the previous six months. (Tr. 453). At that appointment, Plaintiff stated she was not doing too well and was sleeping 15 hours a day. with no motivation to do anything or to leave the house. (Tr. 458). On March 27, 2007, Plaintiff's case manager noted she continued to show steady improvement. (Tr. 444-45).

In early 2007, Plaintiff apparently sought a weight loss surgery recommendation from Dr. Rhodes. (Tr. 287). Plaintiff complained of shoulder pain to Dr. Rhodes on March 13, 2007. (Tr. 285). He ordered an MRI, which was completed on March 16, 2007. (Tr. 356). The radiologist, Dr. Jeffrey Brannick, noted there was a small amount of fluid in the subcoracoid region, but the MRI was otherwise unremarkable. *Id*. Dr. Rhodes refilled Plaintiff's anxiety medication on April 18, 2007. (Tr. 281). Plaintiff saw Dr. Rhodes on May 2, 2007, complaining of being shaky and sweating. (Tr. 280).

Plaintiff saw Dr. Mark T. Cutright at NorthCrest Orthopaedics on May 7, 2007. (Tr. 252-56). Dr. Cutright noted Plaintiff complained of left shoulder pain that had been going on for a number of years but had worsened over the last six months. (Tr. 252). Plaintiff rated her pain with medication as a 3 on a scale of 1 to 10. *Id*. Her MRI was essentially normal. *Id*. Dr. Cutright described her range of motion as full, normal, being 140/60/70/70. *Id*. He diagnosed left rotator cuff tendinitis with associated bicipital tendinitis on MRI. (Tr. 253). He prescribed Lodine, an injection of Depo-Medrol and lidocaine, and physical therapy. *Id*.

Plaintiff returned to Centerstone on June 18, 2007, where she reported she was sleeping for nine hours and lying around all day. (Tr. 426). At a follow-up two weeks later, Plaintiff reported having more energy and fewer crying spells overall after trying a new medication. (Tr. 420). On July 31, 2007, Plaintiff stated she has good and bad days regarding her energy and motivation level, but she enjoys keeping house. (Tr. 415). Two weeks later, Plaintiff stated she was sleeping less, approximately 8 hours, and was more motivated. (Tr. 406).

On August 8, 2007, Plaintiff saw Dr. Walter W. Frey, M.D. regarding the presence of floaters in both eyes for approximately one year. (Tr. 298). Dr. Frey diagnosed mild vitreous degeneration in both eyes but otherwise normal. *Id*.

On August 13, 2007, Kathryn B. Sherrod, Ph.D., examined Plaintiff at the request of Disability Services. (Tr. 301-08). Dr. Sherrod stated that Plaintiff reported information during her interview that contradicted the information she provided in her background paperwork, specifically regarding substance abuse and having her driver's license revoked. (Tr. 301). Plaintiff told Dr. Sherrod that she was unable to work because of her depression, and there are days she does not want to get out of bed. *Id*. On her background paperwork, Plaintiff indicated she did not drink alcohol, but she told Dr. Sherrod that she had consumed liquor a few times but not since her early 20's. (Tr. 301-02). With regard to illegal drug use, Plaintiff did not respond to the question on the paperwork but told Dr. Sherrod that she smoked marijuana from age twenty to thirty and had served six years in prison, from 1993 through 1998, for conspiracy to distribute marijuana. (Tr. 302). Plaintiff also reported on her background paperwork that her driver's license had never been revoked, but she told Dr. Sherrod it was revoked once when she was 18, for a DUI. (Tr. 303). She currently has a valid driver's license and drives two or three days a

week. *Id*

Plaintiff told Dr. Sherrod that she cleans her house on good days, makes a sandwich for lunch, watches television, and prepares dinner with her husband. (Tr. 303). She likes to work around the house, decorate, clean, paint and rearrange furniture, and shop. *Id*. She is able to adequately tend to her personal care. *Id*. On her worst days, which usually occur two to four times a week, Plaintiff sleeps most of the day. *Id*. Her best days usually occur one to two times a week. *Id*. Plaintiff occasionally does the grocery shopping and visits her relatives once or twice a month. *Id*.

Dr. Sherrod noted Plaintiff's effort on testing was "marginal," giving up as items became difficult. (Tr. 304). She therefore concluded Plaintiff's test results "slightly underestimate her current level of functioning." *Id*. Dr. Sherrod stated Plaintiff apparently had no problems comprehending instructions, and her concentration and eye contact appeared to be adequate. *Id*. Plaintiff also displayed no symptoms of depression, laughing and making jokes at times and reporting her problems casually. *Id*. Dr. Sherrod administered the Lie and Frequency scales from the MMPI-2 and noted Plaintiff did not appear to be presenting herself in an unusually positive light or exaggerating the severity of her symptoms. *Id*. Dr. Sherrod measured Plaintiff's WAIS-III Verbal Comprehension as 78 and Perceptual Organization as 78, which are in the borderline range. (Tr. 305). Plaintiff's WRAT-4 scores were 74 for reading, 81 for sentence comprehension, and 86 for arithmetic, which are in the borderline (reading) to low average (sentence comprehension and arithmetic) range. *Id*. Dr. Sherrod believed Plaintiff's scores would have been in the low average range for reading had she given greater effort. *Id*.

Dr. Sherrod also administered a test for malingering, consisting of 15 items presented in

five sets of three items. (Tr. 305). Plaintiff's errors of omission led Dr. Sherrod to conclude Plaintiff may have not represented her cognitive skills honestly. *Id*. Dr. Sherrod assessed Plaintiff's GAF score at 60. (Tr. 306). She believed Plaintiff should be assessed for alcohol abuse and cannabis dependence. *Id*.

At an appointment at Centerstone on October 12, 2007, Plaintiff stated she had a panic attack during a birthday party at her house with 20 guests. (Tr. 391). She also reported needing to leave Wal-Mart on one occasion, but she went back later in the evening when it was not so crowded. *Id*.

On October 16, 2007, Plaintiff was diagnosed with severe chronic cystitis and urethral stenosis. (Tr. 312). She has a history of frequent urinary tract infections. (Tr. 312-13).

Dr. Bruce Davis performed a consultative exam of Plaintiff on October 29, 2007. (Tr. 318-20). He noted Plaintiff had reduced shoulder abduction and forward raising (150 degrees). (Tr. 319). She had normal knee flexion in her left knee. *Id*. He diagnosed Plaintiff with class 2 obesity, with a body mass index greater than 35; cardiovascular disease: hypertension, hyperlipidemia; musculoskeletal disease: shoulder, back, knee complaints; gastrointestinal disease: acid reflux and esophagitis, hepatitis C infection, cholecystectomy; vitreous floaters; hysterectomy; tubal ligation; and frequent urinary tract infections. (Tr. 320). He opined Plaintiff could occasionally lift 10-20 pounds and could frequently lift 10 pounds. *Id*. She could stand or walk 4 hours in an 8-hour workday, less than 1 hour uninterrupted, and she could sit 8 hours in an 8-hour workday. *Id*. She was limited in bending, squatting, and overhead reaching, and she should have limited exposure to heat and humidity, climbing or heights, and exposure to liver damaging chemicals. *Id*

C. Warren Thompson, Ph.D., completed a consultative Psychiatric Review Technique dated November 14, 2007. (Tr. 322-39). He believed Plaintiff had mild restrictions in activities of daily living; moderate restrictions in maintaining social functioning and concentration, persistence, or pace; and no episodes of decompensation. (Tr. 332). He noted Plaintiff reported completing a range of household chores and that her effort on IQ testing was minimal. *Id*. He believed Plaintiff was experiencing no more than moderate limitations. *Id*. He noted Plaintiff could remember and understand simple and detailed, non-complex tasks, could sustain concentration and persistence for those tasks, would experience some but not substantial difficulty interacting with the public and supervisors and coworkers, and could set limited goals and adapt to infrequent change. (Tr. 338).

Plaintiff had an MRI of her lumbar spine on November 29, 2007. (Tr. 351). The radiologist, Dr. Cody Crase, noted Plaintiff had mild central disk bulges at L4-L5 and L5-S1 with associated facet joint osteoarthritis resulting in mild carnal stenosis. *Id*. No significant neural foraminal narrowing was noted. *Id*.

On December 7, 2007, Plaintiff reported no improvement in her depression and anxiety. (Tr. 379). She told her case manager she had poor appetite, low energy, and had frequent crying spells. *Id*.

Larry W. Welch, Ed.D., completed a consultative Medical Residual Functional Capacity Assessment dated March 3, 2008. (Tr. 582-85). Dr. Welch noted Plaintiff was moderately limited in 11 of 20 categories. (Tr. 582-83). He believed Plaintiff has the functional capacity to understand, remember and complete detailed tasks on a regular and continual basis with occasional difficulty sustaining concentration, persistence, and pace; that Plaintiff is able to

interact with small groups, one-on-one, with occasional general public interaction, and no anticipated problems with supervisors or coworkers; and that Plaintiff is able to adapt to routine, not frequent or fast-paced, change. (Tr. 584).

Dr. Reeta Misra performed a Physical Residual Functional Capacity Assessment dated March 23, 2008. (Tr. 587-592). Dr. Misra opined Plaintiff could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand and/or walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday. (Tr. 588). She could occasionally climb ladders, ropes, and scaffolds, with no other postural limitations. (Tr. 589).

Plaintiff's primary care physician for several years, Dr. Michael Rhodes, completed a questionnaire drafted by Plaintiff's attorney, Bill Underhill, on November 17, 2009.[5] (Tr. 737). Dr. Rhodes stated that he treats Plaintiff for high blood pressure, urinary tract infection, let shoulder and back pain, and anxiety. *Id*. This treatment has been long-term, and the medical conditions are severe. *Id*. He believed the severe medical conditions had existed since his first treatment of Plaintiff in 2005. *Id*.

Dr. Bert Hartman, Plaintiff's psychiatrist at Centerstone, completed a Medical Source Statement dated December 1, 2009. (Tr. 739-41). Dr. Hartman noted Plaintiff reported panic attacks, depression, difficulty concentrating, and problems with memory and task completion. (Tr. 739). He believed these led to moderate limitations in understanding, remembering, and carrying out short, simple instructions and marked limitations in understanding, remembering, and carrying out detailed instructions and in the ability to make judgments on simple work-related decisions. *Id*. He believed Plaintiff had marked limitations in interacting appropriately

---

[5] As Plaintiff's attorney indicated at the hearing, Dr. Rhodes refused to complete a Medical Source Statement on Plaintiff's behalf.

with the public, supervisors, co-workers, and in responding appropriately to work pressures and changes in a work setting. (Tr. 740). His basis for this opinion was Plaintiff's report that she has difficulty relating to other people and is overly self-conscious. *Id*.

At her hearing, Plaintiff testified that she completed the 11th grade and later obtained her GED. (Tr. 41). She can read and write at approximately the 4th grade level. *Id*. She has a certificate in electricity. (Tr. 43). She has applied for jobs since September 2006, but she was not hired. *Id*.

Plaintiff stated she was not able to work between September 2006 and December 2007 because she had a lot of problems after losing her job and felt like she was not capable of performing work. (Tr. 43). She was fired from her cashier's job because she was not fast enough. (Tr. 43-44). Her depression, nerves, urinary tract infections, and back and shoulder pain kept her from working from 2006 to 2007. (Tr. 44).

Plaintiff's primary care physician is Dr. Rhodes. (Tr. 44). She saw Dr. McClain prior to beginning treatment with Dr. Rhodes. *Id*. Plaintiff's attorney stated he had repeatedly asked Dr. Rhodes to complete a medical source statement, but he refused. (Tr. 50). Dr. Rhodes did complete the form Plaintiff's attorney submitted. *Id*.

She has been treated for her mental problems at Centerstone since 2006. (Tr. 44). She began seeing a new therapist, Dr. Hartmann, shortly before her administrative hearing. (Tr. 45). In 2006 and 2007, Plaintiff was sleeping up to 20 hours a day and had no desire to do things she had wanted to do before. (Tr. 46). Medication helped, but she still had problems. *Id*. Plaintiff stated her mental problems have gotten worse and that she can no longer leave the house unless she absolutely has to, and she has panic attacks. *Id*

She had mood swings and nervousness during the September 2006 through December 2007 period. (Tr. 50). Her mood swings and irritation were often caused by interactions with her teenaged stepchildren. (Tr. 50-51). The children moved out between 2006 and 2009. (Tr. 52-53). Plaintiff got somewhat better after some of them moved out. (Tr. 53). Plaintiff also had trouble sleeping and would sometimes get up in the middle of the night. (Tr. 51). She also suffered from fatigue, and she would do nothing on bad days because she had no desire to do anything. (Tr. 54). Plaintiff testified that her inability to work is more as a result of her mental limitations than her physical limitations. (Tr. 49).

Plaintiff testified that she was in jail in 1993 for conspiracy to distribute marijuana. (Tr. 46-47). She has not used marijuana in recent years. (Tr. 49). She was addicted to prescription pain medicine in approximately 2005. (Tr. 49). She went to drug rehabilitation. *Id*.

Dr. Lyon performed surgery on Plaintiff's left knee in March 2006. (Tr. 47). Plaintiff stated she still has some problems going up steps, and she experiences aches, but it is a lot better than before surgery. *Id*. She consulted Dr.Cutright in March 2007 about her left shoulder. *Id*. Her shoulder causes her pain, usually when she bends her elbow and tries to lift something. *Id*. Plaintiff has not consulted any specialists about her back pain. (Tr. 48).

Plaintiff believes hepatitis C might be a cause of her lack of energy. (Tr. 48).

Plaintiff consulted with a heart specialist in April 2009, but she did not have any heart difficulties in 2006 or 2007. (Tr. 48). She has difficulty breathing, and her heart beats fast sometimes. *Id*. She also has some pain in her heart. *Id*.

Vocational Expert ("VE") Jane Brenton described Plaintiff's past relevant work as an electrician's helper (medium, low semi-skilled, no transferable skills) and as a cashier (light, low

semi-skill, no transferable skills). (Tr. 40). The ALJ asked the VE to assume a person of the Plaintiff's age, education, and work experience with the limitations suggested by consultant Dr. Davis (Tr. 320),[6] and with the ability to understand, remember, and carry out short, simple instructions, make judgments on simple work-related decisions, with occasional interaction with the public, not production rate pace quoted jobs, or jobs with a change in work procedures or requirements, instead simple, routine tasks. (Tr. 56-57). The VE testified that such a person could not do Plaintiff's past relevant work. (Tr. 57). However, a person could perform sedentary jobs, including checker positions (1,200 in Tennessee and 74,000 in the U.S.), inspector positions (7,000 in Tennessee and 250,000 in the U.S.), and addresser positions (1,500 in Tennessee and 191,000 in the U.S.). (Tr. 57-58). She further testified that a person with a GAF score in the range of 51 through 60 would be able to perform these jobs. (Tr. 59). The identified jobs would not necessarily require literacy. *Id*. The jobs would still be available if the person were limited to occasional postural activities and a sit/stand option at will. *Id*.

The VE testified that Dr. Hartman's medical source statement would preclude work. (Tr. 59). With regard to Dr. Rhodes's form dated November 17, 2009, the VE stated his responses would not indicate sufficient functional limitations for her to decide whether there would be any impact on the jobs identified. (Tr. 59-60). Further, if Plaintiff's testimony were taken as fully credible, she would not be able to perform any of the jobs identified. (Tr. 60).

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

---

[6] The ALJ clarified that these restrictions were lifting and/or carrying ten to twenty pounds occasionally and ten pounds frequently; standing and/or walking up to four hours in the workday, but less than one at a time; sitting up to eight hours; occasional bending, squatting, and overhead reaching; and no exposure to heat or humidity, climbing, heights, or liver damaging chemicals. (Tr. 57).

Plaintiff alleges three errors committed by the ALJ. First, the ALJ did not give appropriate weight to the opinions of Plaintiff's treating physicians. Second, the ALJ wrongfully found Plaintiff's testimony was not fully credible. Third, the residual functional capacity determination found by the ALJ is inaccurate.

A.     Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.     Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.     The ALJ Properly Considered the Opinion of Plaintiff's Treating Physicians

---

[7] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Plaintiff argues that the ALJ failed to give proper consideration to the opinions of Dr. Rhodes and Dr. Hartman. Specifically, Plaintiff believes the ALJ erred by giving little weight to Dr. Rhodes's November 17, 2009 memorandum and June 6, 2010 residual functional capacity form (not submitted to the ALJ) and to Dr. Hartman's residual functional capacity assessment.

As an initial matter, Plaintiff argues that the ALJ should have considered the June 6, 2010 residual functional capacity form, which was submitted as an exhibit to her brief and is more restrictive than the ALJ's adopted RFC. (Docket Entry 13). Plaintiff also claims she submitted this form to the Appeals Council, but it was misplaced and is not a part of the administrative record. The Court may consider additional evidence only if it is new and material and if Plaintiff shows good cause for failing to submit it to the ALJ. *Hollon v. Comm'r*, 447 F.3d 477, 484-85 (6th Cir. 2006). Remand under sentence six of 42 U.S.C. § 405(g) is appropriate when the evidence relates to Plaintiff's condition at the time of the administrative proceedings and if Plaintiff shows good cause for failing to submit that evidence during the administrative proceedings. *See Jones v. Comm'r*, 336 F.3d 469 (6th Cir. 2003). When this evidence has been submitted to the Appeals Council in an unsuccessful request for review, the Court cannot consider it except in support of a sentence six remand. *See Cline v. Shalala*, 96 F.3d 146, 148-49 (6th Cir. 1996).

When deciding whether to remand the case for further proceedings consistent with sentence six of 42 U.S.C. § 405(g), Plaintiff must first demonstrate that the evidence is new and material, that is, that there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711-12 (6th Cir. 1988). Even if Plaintiff can demonstrate that this evidence is material, which is doubtful given that Dr. Rhodes's treatment

notes do not indicate Plaintiff is restricted in her daily activities, she must also have good cause for

failing to submit the evidence to the ALJ. In order to show good cause, Plaintiff must

"demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for

inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)

(citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984)). Plaintiff has not

demonstrated good cause, and a sentence six remand is not appropriate here. At the hearing,

Plaintiff's counsel clearly indicated that he knew an assessment by Dr. Rhodes would be useful

evidence, but he stated Dr. Rhodes had declined to complete a medical source statement. (Tr. 50).

While it is unfortunate Plaintiff was unable to convince Dr. Rhodes to complete a medical source

statement before the ALJ's decision, the Magistrate Judge does not believe this is good cause to

remand the case. Plaintiff has the burden to provide a complete record. *Landsaw v. Sec'y of Health

& Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). Plaintiff had more than two and one-half

years between the date of her application and the date of the ALJ hearing to obtain a statement

from Dr. Rhodes, but she failed to do so. Therefore, the Magistrate Judge declines to recommend

remand of this case under sentence six of 42 U.S.C. § 405(g).

Plaintiff argues that the ALJ failed to consider Dr. Rhodes's November 17, 2009

memorandum and Dr. Rhodes's "opinion that Ms. Pulley was unable to work." (Docket Entry 13,

p. 7; Tr. 737). This patently mischaracterizes Dr. Rhodes's memorandum. Dr. Rhodes's responses

to the questions in the memoranda at most indicate that Plaintiff suffers from certain severe

impairments. (Tr. 737). Dr. Rhodes offers no opinion as to Plaintiff's ability to do work-related

tasks.

Plaintiff also argues that the ALJ erred by giving the opinion of Dr. Hartman little weight.

(Tr. 739-41). An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

While Plaintiff was treated at Centerstone for several years, she began seeing Dr. Hartman only shortly before her administrative hearing, in December 2009. (Tr. 45). There is no indication Plaintiff was treated by Dr. Hartman during the relevant period. Even if this were not the case, Dr. Hartman's opinion is not consistent with the record as a whole. Dr. Hartman assessed Plaintiff as having marked restrictions in several areas, including all aspects of relating appropriately to supervisors, co-workers, and the public. (Tr. 739-40). Plaintiff's treatment records at Centerstone,

however, indicate that she was improving overall with medication. (Tr. 391, 444-45, 467, 484). While she did occasionally have anxiety attacks in large crowds, Plaintiff told Dr. Sherrod, the consultative examiner, that she visits relatives and maintains relationships with them. (Tr. 303, 391). On the one occasion she had an anxiety attack in Wal-Mart and needed to leave, she was able to return on the same date, at a less crowded time. (Tr. 391).

The ALJ inexplicably seems to place a large emphasis (using italicized typeface) on Dr. Hartman's use of the word "report." (Tr. 25-26). The Magistrate Judge, while not a psychiatrist, is unsure how Dr. Hartman would ascertain information regarding Plaintiff's mental status without Plaintiff telling - or "reporting" - this information. The use of the word "reports" is also not inconsistent with Dr. Hartman reviewing Plaintiff's treatment notes, as the ALJ seems to believe it is. The ALJ relies far too heavily on this seemingly innocuous language in discrediting Dr. Hartman's opinion. As the Commissioner points out, however, it is unclear whether Dr. Hartman dated his opinion, and his use of the present tense could indicate that he was reporting on Plaintiff's mental condition as of December 1, 2009. (Tr. 739-41). In any event, the Magistrate Judge believes the ALJ properly weighed Dr. Hartman's opinion for the reasons set forth above.


D.      The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ improperly assessed Plaintiff's credibility by finding Plaintiff had no severe substance abuse impairment and credited Plaintiff's testimony regarding her sobriety and by ignoring the absence of medical opinions from her treating physicians that she was malingering or exaggerating her symptoms. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of

observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

Here, the ALJ discounted Plaintiff's credibility for three reasons. (Tr. 28-29). First, Plaintiff testified that she was fired from her last job because her performance was not fast enough, but she told her counselor at Centerstone that she "blew up" at her boss. (Tr. 28, 43-44, 303, 531). Second, Plaintiff denied all drug and alcohol use in her testimony other than marijuana and pain medication abuse (both of which are in remission), but she informed her counselor at Centerstone that she had experimented with cocaine, and she reported to Dr. Sherrod that her license had been revoked in the past for driving under the influence of alcohol, despite not answering a written question regarding her drug use. (Tr. 28, 487-89, 516, 522, 553). Third, Plaintiff provided inconsistent and conflicting answers during Dr. Sherrod's exam with regard to her substance abuse and drunk driving conviction. (Tr. 28-29, 306). Contrary to Plaintiff's assertions, the ALJ did not discount Plaintiff's credibility because she had a substance abuse impairment but because she was inconsistent in her statements regarding her past alcohol and drug use. Similarly, the absence of statements from Plaintiff's treating physicians regarding exaggeration or malingering is not wholly indicative of Plaintiff's credibility. The Magistrate Judge believes these reasons, particularly Plaintiff's inconsistent statements to Dr. Sherrod, are substantial evidence justifying the ALJ's credibility finding.

F.      The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

Plaintiff argues that the RFC reached by the ALJ is inaccurate because it is inconsistent

with the June 6, 2010 medical source statement provided by Dr. Rhodes and with the medical source statement provided by Dr. Hartman. (Docket Entry 13; Tr. 739-41). Plaintiff also points to the ALJ's description of Plaintiff "blowing up" at her former supervisor in 2002 as evidence of her marked difficulty in interacting appropriately with supervisors. To the extent that this error is an attempt to object to the ALJ's treatment of the opinions of Dr. Rhodes and Dr. Hartman, the Magistrate Judge adopts his above-stated opinion regarding this alleged error. Moreover, as the Commissioner points out, Plaintiff's confrontation with her supervisor occurred in 2002, four years before the relevant period here. There is no indication that this altercation is relevant with respect to Plaintiff's mental condition in 2006 and 2007. The fact that the ALJ used this episode to evaluate Plaintiff's credibility - because she testified to a different version of events than her records indicated - does not mean that the ALJ need consider it as medical evidence of Plaintiff's disability. The Magistrate Judge therefore believes the ALJ had substantial evidence for his RFC finding.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912

(6th Cir. 2004) (en banc).

ENTERED this 29th day of August, 2011.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge